UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JOHN RUSSELL BARNETT, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No.: 7:22cv229 |
| UNITED STATES OF AMERICA, | ) |
|    Christopher R. Kavanaugh, United States Attorney | ) |
|    310 1st Street, S.W., Room 906 | ) |
|    Roanoke, Virginia 24011 | ) |
| Defendant. | ) |

### COMPLAINT

COMES NOW John Russell Barnett (hereafter "John"), by counsel, and files his Complaint against United States of America (hereafter "United States") and states as follows in support thereof:

PARTIES, VENUE AND JURISDICTION

1. John served in the United States Navy for over 13 years during which time he received many honors including the Joint Service Achievement Medal, Navy Unit Commendation (3), Meritorious Unit Commendation (3), Navy 'E' Ribbon, Good Conduct Medal (3), Southwest Asia Service Medal (2), Kosovo Campaign Medal, Global War on Terrorism Service Medal, and Sea Service Deployment Ribbon (4).

2. On October 25, 2011 John was honorably discharged from the United States Navy.

3. After honorable discharge from the United States Navy, John has worked in several positions with the United States Department of Veterans Affairs going from a

housekeeping aide in facilities management at the Salem VA Medical Center (hereafter "Salem VAMC") to his current position as lead voucher examiner.

4. John certifies that he has obtained from expert witnesses, whom he reasonably believe would qualify as expert witnesses pursuant to subsection A of § 8.01-581.20, written opinions signed by the expert witnesses that, based upon a reasonable understanding of the facts, the United States, for which service of process has been requested, deviated from the applicable standard of care and the deviations were a proximate cause of his injuries and damages.

5. By certified letter dated July 12, 2021, John timely and properly presented this claim against the United States through a Notice of Claim pursuant to 28 U.S.C. § 2675 of the Federal Tort Claims Act on the appropriate federal agency (United States Department of Veterans Affairs).

6. John's Notice of Claim was received by the United States Department of Veterans Affairs on July 13, 2021.

7. By letter dated January 27, 2022 the United States Department of Veterans Affairs denied Plaintiff's Notice of Claim.

8. As a result of the United States' denial of John's Notice of Claim, John has instituted this action upon a claim against the United States for money damages for his injuries and damages caused by the negligent, wrongful acts, and/or omissions of the United States and its employees while acting within the scope of their offices or employments.

9. At all times and places pertinent to this action, the United States acted by and through its employees including, but not limited to: Jeffrey M. Preuss, M.D.; Bharatbhai G. Patel, M.D.; George Bradley, R.N.; Sherry Vanantwerp, R.N.; Pepper R. Bain, R.N.; Danielle Marks, R.N.; Brent D. Viers, D.O.; Sarika K. Patel, P.A.; Ashley N. Evans; Brian Dezzutti,

M.D.; Christina Atkinson, R.N.; Traci J. Westberg, R.N.; Termecka Brown, R.N.; Lois Lail, L.P.N.; Tetyana Mehalechko, M.S.A.; Kevin Manning, R.N.; Kimberly D. Gearheart; Claude E. Worthington, M.S.A.; Laurel C. Riddle, M.S.; Any H Di Benedetto; Tamara Calloway, R.N.; Amber L. Hernandez, M.S.A.; Nathaniel D. Bennett, P.A.; Sherry A. Jenkins, M.S.A.; Ocie P. Fidler; Donna Young; and James F. Deyerle, M.S.A.

10. Under the doctrine of *respondeat superior*, the United States is liable for the actions and inactions of its employees including, but not limited to: Jeffrey M. Preuss, M.D.; Bharatbhai G. Patel, M.D.; George Bradley, R.N.; Sherry Vanantwerp, R.N.; Pepper R. Bain, R.N.; Danielle Marks, R.N.; Brent D. Viers, D.O.; Sarika K. Patel, P.A.; Ashley N. Evans; Brian Dezzutti, M.D.; Christina Atkinson, R.N.; Traci J. Westberg, R.N.; Termecka Brown, R.N.; Lois Lail, L.P.N.; Tetyana Mehalechko, M.S.A.; Kevin Manning, R.N.; Kimberly D. Gearheart; Claude E. Worthington, M.S.A.; Laurel C. Riddle, M.S.; Any H Di Benedetto; Tamara Calloway, R.N.; Amber L. Hernandez, M.S.A.; Nathaniel D. Bennett, P.A.; Sherry A. Jenkins, M.S.A.; Ocie P. Fidler; Donna Young; and James F. Deyerle, M.S.A.

11. Pursuant to the Federal Tort Claims Act, the United States is liable in the same manner and to the same extent as a private individual under like circumstances for the negligent, wrongful acts, and/or omissions of its employees including, but not limited to, Jeffrey M. Preuss, M.D.; Bharatbhai G. Patel, M.D.; George Bradley, R.N.; Sherry Vanantwerp, R.N.; Pepper R. Bain, R.N.; Danielle Marks, R.N.; Brent D. Viers, D.O.; Sarika K. Patel, P.A.; Ashley N. Evans; Brian Dezzutti, M.D.; Christina Atkinson, R.N.; Traci J. Westberg, R.N.; Termecka Brown, R.N.; Lois Lail, L.P.N.; Tetyana Mehalechko, M.S.A.; Kevin Manning, R.N.; Kimberly D. Gearheart; Claude E. Worthington, M.S.A.; Laurel C. Riddle, M.S.; Any H Di Benedetto;

Tamara Calloway, R.N.; Amber L. Hernandez, M.S.A.; Nathaniel D. Bennett, P.A.; Sherry A. Jenkins, M.S.A.; Ocie P. Fidler; Donna Young; and James F. Deyerle, M.S.A.

12. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) because this is a civil action on a claim against the United States for money damages, accruing on and after January 1, 1945, for personal injury caused by the negligent, wrongful acts, and/or omissions of employees of the United States while acting within the scope of their office and/or employment, under circumstances where the United States, if a private person, would be liable to John in accordance with the law of the Commonwealth of Virginia where the acts and omissions occurred.

13. Venue is appropriate in the Roanoke Division pursuant to 28 U.S.C. § 1402 because this is a civil action on a tort claim against the United States under 28 U.S.C. § 1346(b) for acts and omissions that occurred in this judicial district.

## DUTY

14. At all times and places pertinent to this action, including December 5, 2020 through December 6, 2020, the United States and its employees (including, but not limited to: Jeffrey M. Preuss, M.D.; Bharatbhai G. Patel, M.D.; George Bradley, R.N.; Sherry Vanantwerp, R.N.; Pepper R. Bain, R.N.; Danielle Marks, R.N.; Brent D. Viers, D.O.; Sarika K. Patel, P.A.; Ashley N. Evans; Brian Dezzutti, M.D.; Christina Atkinson, R.N.; Traci J. Westberg, R.N.; Termecka Brown, R.N.; Lois Lail, L.P.N.; Tetyana Mehalechko, M.S.A.; Kevin Manning, R.N.; Kimberly D. Gearheart; Claude E. Worthington, M.S.A.; Laurel C. Riddle, M.S.; Any H Di Benedetto; Tamara Calloway, R.N.; Amber L. Hernandez, M.S.A.; Nathaniel D. Bennett, P.A.; Sherry A. Jenkins, M.S.A.; Ocie P. Fidler; Donna Young; and James F. Deyerle, M.S.A.) had a healthcare provider-patient relationship with John.

15. At all times and places pertinent to this action, including December 5, 2020 through December 6, 2020, the United States and its employees (including, but not limited to: Jeffrey M. Preuss, M.D.; Bharatbhai G. Patel, M.D.; George Bradley, R.N.; Sherry Vanantwerp, R.N.; Pepper R. Bain, R.N.; Danielle Marks, R.N.; Brent D. Viers, D.O.; Sarika K. Patel, P.A.; Ashley N. Evans; Brian Dezzutti, M.D.; Christina Atkinson, R.N.; Traci J. Westberg, R.N.; Termecka Brown, R.N.; Lois Lail, L.P.N.; Tetyana Mehalechko, M.S.A.; Kevin Manning, R.N.; Kimberly D. Gearheart; Claude E. Worthington, M.S.A.; Laurel C. Riddle, M.S.; Any H Di Benedetto; Tamara Calloway, R.N.; Amber L. Hernandez, M.S.A.; Nathaniel D. Bennett, P.A.; Sherry A. Jenkins, M.S.A.; Ocie P. Fidler; Donna Young; and James F. Deyerle, M.S.A.) owed John the duty to act with the degree of skill and diligence of a reasonably prudent health care provider in the field of practice or specialty in the Commonwealth of Virginia. *See* Va. Code § 8.01-581.20(A).

SUMMARY TIMELINE OF EVENTS

*Saturday, December 5, 2020*

16. On Saturday, December 5, 2020 John was taken to the Salem VAMC emergency department by his wife.

17. Around 9:18 a.m. George Bradley, R.N. triaged John.

18. Mr. Bradley found that:

   a. John had neck pain that started 2 days ago with no trauma

   b. John's neck pain radiated from shoulder to head

   c. John's blood pressure was 156/82

   d. John's pulse was 83

   e. John's respirations were 16

    f. John's temperature was 99.3F

    g. John's pulse oximetry was 96% on room air

    h. John's pain was 10/10

    i. John's pain was sharp

    j. John's pain was in the right side of his neck

    k. John had a headache

    l. John's headache was of new onset

    m. John had normal color

    n. John had no skin abnormalities

    o. John had no dizziness

    p. John had no photophobia

    q. John moved all extremities

    r. John had no blurred vision

    s. John had no weakness

    t. John's gait was steady

    u. John was not incoherent.

19. Mr. Bradley gave John an Emergency Severity Index level of 3.

20. Around 9:20 a.m. John reached the treatment area and was awaiting Dr. Bharatbhai G. Patel's evaluation.

21. Around 9:26 a.m. Dr. Patel saw John.

22. Dr. Patel found that John was having neck pain that started 2 days ago with no trauma.

23. Dr. Patel found that John's pain radiated from his shoulder to his head.

24. Dr. Patel noted John's vital signs taken by Mr. Bradley in triage.

25. Dr. Patel found a non-focal neurological examination.

26. Dr. Patel's differential diagnosis was migraine versus cervicalgia.

27. Around 10:03 a.m. John was given an intramuscular injection of Ketorolac 60 mg.

28. Around 1:05 a.m. John was given an intramuscular injection of Ondansetron 4 mg.

29. Around 11:20 a.m. John's pain was reassessed and his pain remained at 8/10, which was intense.

30. John's pain was in his head, neck and right shoulder.

31. The quality of John's pain was aching and nagging.

32. John did not know the cause of his pain.

33. There was nothing that made John's pain better or worse.

34. The pain affected John's concentration and sleeping.

35. There were no physical findings at the location of John's pain.

36. Dr. Patel was made aware of this information by Mr. Bradley.

37. Dr. Patel ordered John to be discharged home with Prednisone for 4 days, continue opiates that he was on at home, and call to follow-up in clinic within 1 week for further management.

38. Around 11:50 a.m. John was given Prednisone 40 mg by mouth per order.

39. Around 11:51 a.m. John was discharged from the Salem VAMC by Mr. Bradley on Dr. Patel's order.

40. On discharge, John was advised that he had no restrictions.

41. With respect to John's December 5, 2020 emergency department visit, the United States and its employees did not appreciate any signs or symptoms suggesting that John had a brain hemorrhage.

42. With respect to John's December 5, 2020 emergency department visit, the United States and its employees did not diagnose John with a brain hemorrhage.

43. With respect to John's December 5, 2020 emergency department visit, the United States and its employees did not treat John for a brain hemorrhage.

44. The United States and its employees take the position that John did not have a brain hemorrhage before his December 5, 2020 emergency department visit.

45. The United States and its employees take the position that John did not have a brain hemorrhage during his December 5, 2020 emergency department visit.

46. The United States and its employees take the position that John's brain hemorrhage occurred after John's December 5, 2020 emergency department visit.

*Sunday, December 6, 2020*

47. The very next day (Sunday, December 6, 2020) John was taken back to the Salem VAMC emergency department by his wife.

48. Around 12:20 p.m. John was triaged by Pepper R. Bain, R.N.

49. John had continued right sided neck and head pain for which he had been seen in the Salem VAMC emergency department the day before.

50. John's pain had gotten worse and he was now having stabbing pain in his right eye, along with lightheadedness when walking.

51. John was found to be alert and oriented.

52. John's vital signs were found to be as follows:

      a. temperature was 98.5F

      b. pulse was 83

      c. respirations were 16

      d. blood pressure was 188/117

      e. his pain was 10/10

      f. his pulse oximetry was 96% on room air.

53. Ms. Bain classified John has level 3 on the Emergency Severity Index.

54. Around 1 p.m. Dr. Preuss was in to evaluate John.

55. Dr. Preuss found that John had continued right sided neck and head pain for which he had been seen in the Salem VAMC emergency department the day before.

56. Dr. Preuss knew that John's pain had gotten worse and he was now having stabbing pain in his right eye, along with lightheadedness when walking.

57. Dr. Preuss said that John's pain radiated from his right upper arm into his right eye and scalp.

58. Dr. Preuss found that John had blurred vision in his right eye with no problems in his left eye.

59. Dr. Preuss said that John had photophobia.

60. Dr. Preuss said that John had no extremity weakness or numbness, fever, chills, sweats, abdominal pain, diarrhea, dysuria, respiratory complaints, chest pain, palpitations, lower extremity pain or swelling.

61. Dr. Preuss said that John had nausea and vomiting last night and now just had nausea.

62. Dr. Preuss said that John did not have dizziness.

63. Dr. Preuss said that he reviewed the triage note by Ms. Bain.

64. Dr. Preuss said that his review of systems was positive for joint pain in neck, back and shoulder, and headaches.

65. Dr. Preuss noted the triage nurse's vital signs for John.

66. On physical examination, Dr. Preuss said that John was in moderate distress, he had tenderness of his right scalp, and he had right lateral neck tenderness.

67. Dr. Preuss had a soft cervical collar applied to John.

68. Sherry Vanantwerp, R.N. performed a nursing assessment that found that:

   a. John's pain was 10/10

   b. John's pain was aching and throbbing

   c. John had nausea

   d. the location of John's pain was in his head and neck

   e. John was alert and oriented

   f. John had a headache

   g. John had no dizziness

   h. John had no photophobia

   i. John was able to move all extremities

   j. John's color was normal

   k. John had no skin abnormalities

   l. John had no blurred vision

   m. John had no weakness

   n. John had dizziness

   o. John was not incoherent.

69. Around 1:35 p.m. John's blood was drawn for laboratory testing.

70. Around 1:38 p.m. John was given normal saline 1 liter up on pump at 999 ml/hr.

71. Around 1:39 p.m. John was given Methylprednisolone 125 mg IVP.

72. Around 1:52 p.m. John was given Prochlorperazine 10 mg diluted in 10 ml normal saline given slowly via IVP over 3-4 minutes.

73. Around 2:30 p.m. Dr. Preuss reassessed John.

74. Dr. Preuss found that John continued to have neck pain and headache.

75. Dr. Preuss noted John's laboratory studies showing an abnormally elevated white blood cell count of 12.7 (3.2-10), a normal red blood cell count of 5.27 (4.7-6.1), a normal hemoglobin of 16.4 (14-18), a normal hematocrit of 47.8 (42-52), normal RDW of 12.7 (11.5-14.5), and a normal platelet count of 196 (130-400).

76. Dr. Preuss attributed John's elevated white blood cell count to steroid use.

77. Dr. Preuss' differential diagnosis was cervicalgia due to cervical spondylosis, migraine headache, elevated white blood count, and hypertension.

78. Dr. Preuss ordered John discharged home with a soft collar for comfort, follow-up with primary care physician for cervical injections, continue his present medications, and return to the emergency room for any problems.

79. Around 2:38 p.m. Dr. Preuss wrote a work excuse note for John asking that he be excused from work for 2 days.

80. Around 2:45 p.m. John's normal saline infusion was completed.

81. John had pain of 4/10 and was moderately sleepy.

82. John was not given any restrictions.

83. John was discharged home by Ms. Vanantwerp upon order of Dr. Preuss.

84. John was taken to the car by wheelchair and his wife drove him home.

85. With respect to John's December 6, 2020 emergency department visit, John's only documented blood pressure was 188/117, which was taken by Ms. Bain around 12:20 p.m.

86. John's blood pressure was not rechecked by the United States and its employees after his 188/117 blood pressure that was taken by Ms. Bain around 12:20 p.m.

87. A significantly elevated blood pressure is defined as a systolic pressure of 180 millimeters of mercury (mm Hg) and/or higher or a diastolic pressure of 120 mm Hg or higher.

88. The United States and its employees knew that a significantly elevated blood pressure is defined as a systolic pressure of 180 millimeters of mercury (mm Hg) and/or higher or a diastolic pressure of 120 mm Hg or higher.

89. John had a significantly elevated blood pressure of 188/117.

90. The United States and its employees knew that John had a significantly elevated blood pressure

91. A significantly elevated blood pressure can cause a brain hemorrhage.

92. The United States and its employees knew that a significantly elevated blood pressure can cause a brain hemorrhage.

93. A significantly elevated blood pressure is the most common cause of brain hemorrhages.

94. The United States and its employees knew that a significantly elevated blood pressure is the most common cause of brain hemorrhages.

95. Also, a significantly elevated blood pressure can worsen an already existing brain hemorrhage.

96. The United States and its employees knew that a significantly elevated blood pressure can worsen an already existing brain hemorrhage.

97. John's significantly elevated blood pressure was not treated by the United States and its employees.

98. A significantly elevated blood pressure should be reduced gradually by approximately 10 to 20 percent in the first hour and by a further 5 to 15 percent over the next 23 hours.

99. The United States and its employees knew that a significantly elevated blood pressure should be reduced gradually by approximately 10 to 20 percent in the first hour and by a further 5 to 15 percent over the next 23 hours.

100. The United States and its employees did not try to reduce John's significantly elevated blood pressure by approximately 10 to 20 percent in the first hour and/or and by a further 5 to 15 percent over the next 23 hours.

101. With respect to John's December 6, 2020 emergency department visit, John had neurologic signs or symptoms.

102. The United States and its employees knew that John had neurologic signs or symptoms during his December 6, 2020 emergency department visit.

103. With respect to John's December 6, 2020 emergency department visit, the United States and its employees did not appreciate any signs or symptoms suggesting that John had a brain hemorrhage.

104. With respect to John's December 6, 2020 emergency department visit, the United States and its employees did not diagnose John with a brain hemorrhage.

105. With respect to John's December 6, 2020 emergency department visit, the United States and its employees did not treat John for a brain hemorrhage.

106. The United States and its employees take the position that John did not have a brain hemorrhage before his December 6, 2020 emergency department visit.

107. The United States and its employees take the position that John did not have a brain hemorrhage during his December 6, 2020 emergency department visit.

108. The United States and its employees take the position that John's brain hemorrhage occurred after John's December 6, 2020 emergency department visit.

*Monday, December 7, 2020*

109. The very next day (Monday, December 7, 2020) in the morning John was transferred via EMS to LewisGale Medical Center's emergency department for his worsening condition.

110. Around 10:09 a.m. John's vital signs included 96% oxygen saturation, blood pressure of 150/84, temperature of 98.2F, pulse of 69, and respirations of 16.

111. John's laboratory testing revealed abnormal results including slight hemolysis, low red blood cell count 3.54 (4.3-5.8), low hemoglobin 11.0 (13.0-17.3), low hematocrit 34.0 (42.0-52.0), and low platelets 124 (130-385).

112. Around 10:55 a.m. John's wife called the Salem VAMC, spoke with Ashley N. Evans, and requested a call from a physician concerning her husband's condition.

113. Around 11:17 a.m. a CT scan of John's head without IV contrast showed a 7.5 cm acute/subacute intraparenchymal hemorrhage of the right temporal lobe with resulting mass effect and 7 mm right to left midline shift.

114. An intraparenchymal hemorrhage is a type of brain hemorrhage in which there is bleeding within the brain parenchyma.

115. The brain parenchyma is the functional tissue in the brain that is made up of two types of brain cells (neurons and glial cells) that are used for cognition and controlling the body.

116. Around 12:20 p.m. Christina Atkinson, R.N. spoke with John's wife.

    a. John's wife explained that John was continuing to have issues with pain and headache.

    b. Ms. Atkinson told John's wife that her husband tested negative for COVID, he was discharged from COVID follow-up, and he should continue the treatment plan.

    c. Ms. Atkinson notified the provider that John was continuing to have issues with pain and headache.

117. Around 12:30 p.m., upon receiving the CT scan findings from the radiologist, the emergency room physician at LewisGale Medical Center discussed John with the on-call neurosurgeon.

118. John was given 3% normal saline and IV Cardizem titrated with systolic blood pressure of 140-160.

119. Cardizem is an antihypertensive medication that is used to treat high blood pressure.

120. Around 12:45 p.m. the emergency room physician discussed John's case with the on-call intensivist who accepted John in the Intensive Care Unit.

121. The emergency room physician's diagnosis was intraparenchymal hematoma of the brain with altered mental status and hypertension.

122. A CT scan of John's neck showed mild cervical spine degenerative change without acute osseous findings.

123. A repeat CTA of John's head showed no evidence of an arterial vascular abnormality such as an aneurysm or AVM, and a stable, large 7 x 5 cm acute intraparenchymal hematoma within the right temporal lobe with similar mass effect and right-to-left midline shift.

124. The radiologist suspected that John's acute intraparenchymal hemorrhage was caused by elevated blood pressure.

*Tuesday, December 8, 2020*

125. On Tuesday, December 8, 2020 in the early morning John underwent another CT scan of his head that showed the relatively stable large right temporal 6.5 cm intraparenchymal hemorrhage with surrounding vasogenic edema resulting in local mass effect upon the adjacent cortical sulci and mild mass effect upon the right lateral ventricle with 7 mm right to left midline shift.

126. Around 8:44 a.m. Sarika K. Patel, P.A. from the Salem VAMC returned Mrs. Barnett's call from the day before.

127. Mrs. Barnett informed Ms. Patel that her husband had suffered a massive brain hemorrhage and he was currently in the Intensive Care Unit at LewisGale Medical Center.

*Wednesday, December 9, 2020*

128. On Wednesday, December 9, 2020 Traci Westberg from the Salem VAMC spoke with LewisGale Medical Center and confirmed that:

    a. John presented to LewisGale Medical Center on December 8, 2020 with the chief complaint of headache and was diagnosed with a large intraparenchymal hemorrhage.

      b.   John was admitted around noon to critical care for his large intraparenchymal hemorrhage.

129.   Ms. Westberg received clinical information for home health consult for skill nursing, physical therapy, and occupational therapy evaluation and treatment from LewisGale Medical Center, and she forwarded that information via facsimile to John's primary care team.

130.   During that day, John underwent another CT scan of his head that showed an evolving, aging, right temporal lobe intraparenchymal hemorrhage without significant change in volume and mass effect resulting in right lateral ventricle effacement, effacement of the right sided cortical sulci, and right to left midline shift of 7 mm, all unchanged.

*Thursday, December 10, 2020*

131.   On Thursday, December 10, 2020 around 3:30 p.m. John underwent an MRI of his brain that showed no significant change in the size and morphology of his right temporal intraparenchymal hemorrhage with mass effect and 6 mm right to left midline shift, and no evidence of an aneurysm or AVM.

*Friday, December 11, 2020*

132.   On Friday, December 11, 2020 around 3:34 p.m. John underwent a CT scan of his head that showed the moderate sized subacute lobar hemorrhage involving the right posterior temporal parietal lobe with similar local mass effect and right-to-left midline shift.

*Saturday, December 12, 2020*

133.   On Saturday, December 12, 2020 John was discharged from LewisGale Medical Center with the diagnosis of intraparenchymal hemorrhage of the brain, on antihypertensive medications, and with prescriptions for outpatient speech, physical and occupational therapies.

## JOHN'S INJURIES AND DAMAGES

134. John has suffered significant and permanent injuries for which he has been receiving care and treatment, and for which he will receive care and treatment for the remainder of his life.

135. John's injuries include, but are not limited to, a large intraparenchymal hemorrhage of the brain, partial visual blindness, double vision, vision issues, light sensitivity, chronic headaches, hearing issues, fatigue, severe irritability, anxiety, easy frustration, agitation, weakness, memory issues, sleep problems, post-traumatic stress disorder, depression, and worsening impulse control.

136. John's injuries affect him in every aspect of his life, both personally and professionally.

137. John has incurred and will incur substantial medical expenses.

138. In addition, John's wife has had to take time off from work to care for John.

139. John has incurred and will incur substantial lost wages and lessening of earning capacity.

140. John is only 49 years old and his life expectancy is another 29.3 years, pursuant to Virginia Code § 8.01-419.

141. John expected to work until he was no longer capable of working, which would have been beyond 67 years of age, so John's future lost wage and lessening of earning capacity claim will exceed another 18 years.

## UNITED STATES' NEGLIGENCE AND ITS CAUSATION

142. The United States and its employees deviated from the standard of care in many respects including, but not limited to, not appreciating the history of John's present illness, not

appreciating John's signs and symptoms, not obtaining a correct history for John's present illness, not properly evaluating John, not properly working-up John's condition, not properly diagnosing John's condition, and not properly treating John's condition.

143. If the United States and its employees had complied with the standard of care, John would have avoided his large intraparenchymal hemorrhage and his resulting significant and permanent injuries for which he has been receiving care and treatment, and for which he will receive care and treatment for the remainder of his life including, but not limited to, partial visual blindness, double vision, vision issues, light sensitivity, chronic headaches, hearing issues, fatigue, severe irritability, anxiety, easy frustration, agitation, weakness, memory issues, sleep problems, post-traumatic stress disorder, depression, and worsening impulse control.

144. As a proximate result of the deviations from the standard of care by the United States and its employees, John suffered his large intraparenchymal hemorrhage and his resulting significant and permanent injuries for which he has been receiving care and treatment, and for which he will receive care and treatment for the remainder of his life including, but not limited to, partial visual blindness, double vision, vision issues, light sensitivity, chronic headaches, hearing issues, fatigue, severe irritability, anxiety, easy frustration, agitation, weakness, memory issues, sleep problems, post-traumatic stress disorder, depression, and worsening impulse control.

145. John seeks fair compensation to the fullest extent permitted under the law for his injuries and damages caused by the negligence of the United States and its employees in the amount of $5,000,000.

## ADVISORY JURY REQUEST

146.    John seeks an advisory jury pursuant to Rule 39 of the Federal Rules of Civil Procedure to hear this matter and make recommendations to the Court.

WHEREFORE, for the foregoing reasons, John Russell Barnett, by counsel, moves this Court for judgment against United States in the amount of $5,000,000 plus his taxable costs with pre-judgment and post-judgment interest on all these amounts.

Respectfully Submitted,

JOHN RUSSELL BARNETT,

_____
Anthony M. Russell (VSB No. 44505)
MICHIE HAMLETT, PLLC
109 Norfolk Avenue, 2nd Floor (24011)
P.O. Box 2826
Roanoke, Virginia 24001
P: (540) 492-5300
F: (540) 492-5400
arussell@michiehamlett.com

Les S. Bowers (VSB No. 77840)
MICHIE HAMLETT, PLLC
310 4th Street N.E.
P. O. Box 298
Charlottesville, Virginia 22902
P: (434) 951-7200
F: (434) 951-7256
lbowers@MichieHamlett.com

*Counsel for Plaintiff*